**No. 24-2422**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

CARLOS PENA,

*Plaintiff-Appellant*,

v.

CITY OF LOS ANGELES, CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:23-cv-05821-JFW-MAA
Hon. John F. Walter

# OPENING BRIEF OF APPELLANT

Luke Hasskamp
Jarod Bona
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
luke.hasskamp@bonalawpc.com
jarod.bona@bonalawpc.com

Jeffrey Redfern
Suranjan Sen
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jredfern@ij.org
ssen@ij.org

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel states Plaintiff-Appellant Carlos Pena, is not a corporate entity and therefore not subject to the requirement of filing a corporate disclosure statement.

Dated: May 28, 2024

/s/ Jeffrey Redfern
Jeffrey Redfern
*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ........................................ii

TABLE OF AUTHORITIES ........................................................ v

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................... 2

STATEMENT OF ISSUES ........................................................... 3

STATEMENT OF CASE .............................................................. 3

SUMMARY OF ARGUMENT ...................................................... 8

STANDARD OF REVIEW .......................................................... 11

ARGUMENT ............................................................................. 11

I. Mr. Pena has sufficiently alleged a Just Compensation claim. .... 11

A. Under the Just Compensation Clause, intentional (or foreseeable) property destruction is no different from appropriation. ............................................................. 11

B. Mr. Pena has sufficiently alleged that the government intentionally (or foreseeably) destroyed his property for a public benefit (capturing a fugitive). ....................................... 15

II. The City has the burden to establish an exception to the Just Compensation Clause using history—and it cannot do so. .......... 20

A. The City has pointed to no historical evidence supporting an applicable exception to the Just Compensation Clause. ...20

B. The best historical analogue for modern policing is the military—which is unquestionably subject to the Just Compensation Clause. ....22

III. Binding precedent forecloses anything like a "police power" exception to the Just Compensation Clause. ....30

A. The Supreme Court has repeatedly disavowed any "police power" exception to the Just Compensation Clause. ....30

B. In applying a "police power" exception, the district court followed non-binding, largely unpublished circuit cases that ignored or misread the Supreme Court. ....36

IV. The Fifth Circuit's decision in Baker is at odds with the district court's reasoning—and is otherwise unpersuasive. ....45

A. The Fifth Circuit rejected a "police power" exception to Just Compensation, then invented a "necessity exception." ....46

B. There is no "necessity exception" to the Just Compensation Clause. ....48

1. Public necessity is a defense against trespass—not an exception to the Just Compensation Clause. ....48

2. A "necessity exception" to Just Compensation is fundamentally at odds with Supreme Court doctrine. ....55

CONCLUSION ....57

STATEMENT OF RELATED CASES ....57

CERTIFICATE OF COMPLIANCE ....58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmeriSource Corp. v. United States*,
525 F.3d 1149 (Fed. Cir. 2008) .................................... 38, 39, 40

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .................................... *passim*

*Armstrong v. United States*,
364 U.S. 40 (1960) .................................... 1, 10, 13, 15

*Baker v. City of McKinney*,
84 F.4th 378 (5th Cir. 2023) .................................... 10, 45, 46, 56

*Baker v. City of McKinney*,
93 F.4th 251 (5th Cir. 2024) .................................... 22, 47

*Bennis v. Michigan*,
516 U.S. 442 (1996) .................................... *passim*

*Bishop v. Mayor & City Council of Macon*,
7 Ga. 200 (1849) .................................... 51

*Bojicic v. DeWine*,
No. 21-4123, 2022 WL 3585636 (6th Cir. Aug. 22, 2022) .................................... 45

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .................................... 13, 35, 36, 57

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................... 11

*City of New York v. Lord*, 17 Wend. 285 (N.Y. Sup. Ct.),
*aff'd*, 18 Wend. 126 (N.Y. 1837) .................................... 50

*Columbian Ins. Co. of Alexandria v. Ashby*,
38 U.S. (13 Pet.) 331 (1839) ..................................................................... 54

*Culley v. Marshall*,
144 S. Ct. 1142 (2024) ............................................................................. 41

*Dayton v. City of Asheville*,
115 S.E. 827 (N.C. 1923) .......................................................................... 49

*Dobbins's Distillery v. United States*,
96 U.S. 395 (1878) ............................................................................... 40, 41

*First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304 (1987) .................................................... 13, 31, 39

*Frein v. Pa. State Police*,
47 F.4th 247 (3d Cir. 2022) ....................................................................... 45

*Grant v. United States*,
1 Ct. Cl. 41 (1863) .................................................................................... 52

*Hale v. Lawrence*,
21 N.J.L. 714 (1848) .................................................................................. 51

*Hernandez v. City of Lafayette*,
643 F.2d 1188 (5th Cir. Unit A May 1981) ............................................. 19

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ............................................................ 28, 29, 33, 39

*Jarvis v. Pinckney*,
21 S.C.L. (3 Hill) 123 (1836) ............................................................ 51, 52

*Jenkins v. United States*,
71 F.4th 1367 (Fed. Cir. 2023) ................................................................. 39

*John Corp. v. City of Houston*,
214 F.3d 573 (5th Cir. 2000) ............................................................. 32, 39

*John Horstmann Co. v. United States*,
257 U.S. 138 (1921)......................................................................17

*Johnson v. Manitowoc County*,
635 F.3d 331 (7th Cir. 2011)...........................................................44

*Kelo v. City of New London*,
545 U.S. 469 (2005)..................................................................43, 44

*Knick v. Township of Scott*,
588 U.S. 180 (2019)..................................................................14, 20

*Lech v. Jackson*,
791 F. App'x 711 (10th Cir. 2019)................................ 36, 37, 38, 42, 44

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005).................................................... 19, 30, 42, 55, 57

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)..................................................... 31, 39, 43, 45

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)................................................................ *passim*

*Mitchell v. Harmony*,
54 U.S. (13 How.) 115 (1851) ..........................................................52

*Mugler v. Kansas*,
123 U.S. 623 (1887)............................................................. 32, 37, 38

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)............................................................................21

*Ostipow v. Federspiel*,
824 F. App'x 336 (6th Cir. 2020).......................................................45

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922)........................................................ 9, 10, 30, 45

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) .......... 13

*Platt v. City of Waterbury*,
45 A. 154 (Conn. 1900) .......... 49

*Pumpelly v. Green Bay & Miss. Canal Co.*,
80 U.S. (11 Wall.) 166 (1872) .......... *passim*

*Sandford v. Nichols*,
13 Mass. 286 (1816) .......... 24

*Sanguinetti v. United States*,
264 U.S. 146 (1924) .......... 16

*Sheetz v. County of El Dorado*,
601 U.S. 267 (2024) .......... 21, 32

*Steele v. City of Houston*,
603 S.W.2d 786 (Tex. 1980) .......... 19, 49

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
560 U.S. 702 (2010) .......... 13, 44

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .......... 13

*Teva Pharms., USA, Inc. v. Weiser*,
No. 1:23-cv-02584-DDD-SKC, 2023 WL 9425674
(D. Colo. Dec. 27, 2023) .......... 36, 37

*The Case of the King's Prerogative in Saltpetre*,
77 Eng. Rep. 1294 (K.B. 1606) .......... 54

*The Palmyra*,
25 U.S. (12 Wheat.) 1 (1827) .......... 41

*TrinCo Inv. Co v. United States*,
722 F.3d 1375 (Fed. Cir. 2013) .......... 49

*Tyler v. Hennepin County*,
598 U.S. 631 (2023) .......... 40

*United States v. Causby*,
328 U.S. 256 (1946) .......... 13, 15

*United States v. Cress*,
243 U.S. 316 (1917) .......... 13, 16

*United States v. Russell*,
80 U.S. (13 Wall.) 623 (1871) .......... 52

*Van Oster v. Kansas*,
272 U.S. 465 (1926) .......... 40

*Wilson v. Arkansas*,
514 U.S. 927 (1995) .......... 24

*Yawn v. Dorchester County*,
1 F.4th 191 (4th Cir. 2021) .......... 10, 17, 32, 39

*YMCA v. United States*,
395 U.S. 85 (1969) .......... *passim*

*Zitter v. Petruccelli*,
744 F. App'x 90 (3d Cir. 2018) .......... 44

**CONSTITUTIONAL PROVISIONS**

Mass. Const. of 1780 .......... 53

Northwest Ordinance of 1787 .......... 52, 53

U.S. Const. amend. V .......... *passim*

Vt. Const. of 1777 .......... 53

**RULES**

9th Cir. R. 28-2.8 .......... 4

**OTHER AUTHORITIES**

Emer de Vattel,
*The Law of Nations*, (Béla Kapossy & Richard Whatmore eds., Thomas Nugent trans., Liberty Fund 2008) (1758) .......... 29

*George Washington's Library Book Returned 221 Years Late,* Reuters (May 20, 2010), https://www.reuters.com/article/us-book-library-washington-idCATRE64J1ZV20100520 .......... 29

John Jay,
*A Freeholder, A Hint to the Legislature of the State of New York* (1778), *reprinted in* 5 *The Founders' Constitution* 312 .......... 28

Jordan R. Plitt et al.,
10A Couch on Insurance § 152:22 (3d ed. 2022) .......... 5

Karan R. Singh,
Note, *Treading the Thin Blue Line: Military Special-Operations Trained Police SWAT Teams and the Constitution*, 9 Wm. & Mary Bill Rts. J. (2001) .......... 27

Restatement (Second) of Torts (Am. L. Inst. 1977) .......... 48, 49, 50

St. George Tucker,
1 *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* (1803) .......... 28

*The Role of Police in American Society: A Documentary History* (Bryan Vila & Cynthia Morris eds., 2019) .......... 23, 25, 26

## INTRODUCTION

If a SWAT team deliberately destroys your property—your business, your car, or even your home—while chasing a totally unrelated criminal suspect, who pays for the damage? The incorporated Fifth Amendment provides the straightforward and inescapable answer: The Just Compensation Clause, which demands compensation for foreseeable damage caused by authorized governmental action, is in fact "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Law enforcement is the quintessential public good. Through our taxes, we pay for police training and equipment. We pay to incarcerate criminals. We pay for a court system and public defenders. When the police destroy private property while enforcing the criminal laws, that is simply another cost of law enforcement. Forcing random, innocent individuals to shoulder that cost alone would be as fair as conducting a lottery to determine who should pay the police chief's salary each year.

Yet that is precisely what the district court has done below: dump the cost of SWAT raids on whatever unlucky individual happens to own property nearby. The district court invented a categorical exception to the Just Compensation Clause whenever government is enforcing its "police power." Thus, absent reversal, the decision below will allow government in this Circuit a free hand to externalize law-enforcement costs onto third-party individuals, so long as its actions comport with Fourth Amendment reasonableness.

The district court's exception is fundamentally at odds with the Constitution's clear demands, as elucidated by both binding precedent and history. When governmental agents take property for the public good, *the public* has a duty to provide Just Compensation for the taking—irrespective of what precise function the taking served. This Court should reverse.

## JURISDICTIONAL STATEMENT

Appellant's claims were brought under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the U.S. Constitution and therefore fell within the district court's federal question jurisdiction. *See* 28 U.S.C. § 1331. The district court entered final judgment on April

2, 2024. ER-5-6. Mr. Pena gave timely notice of his appeal on April 12, 2024. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The Supreme Court has repeatedly held that, when government foreseeably damages an innocent person's property for the public good, that damage represents a "taking" requiring compensation pursuant to the incorporated Fifth Amendment to the U.S. Constitution. Moreover, the Supreme Court has held that the government bears the burden of establishing that any exception to the plain text of the Bill of Rights is grounded in our nation's history and tradition. The question in this appeal is whether the City has met its burden of showing that the Just Compensation Clause carries an implicit, categorical exception for property damaged while enforcing the police power?

## STATEMENT OF CASE[1]

Plaintiff-Appellant Carlos Pena owned and operated a small print shop in North Hollywood for over 30 years—until a Los Angeles SWAT

---

[1] There are no disputed material facts in this appeal, which asks only whether there is a categorical exception to the Just Compensation

team, in pursuit of a totally unrelated fugitive, destroyed his shop and essentially everything in it. Somehow, the fugitive escaped, and Mr. Pena's livelihood lay in ruins.

More than three decades ago, Mr. Pena became a naturalized citizen after moving his family to California from El Salvador. He started his own business, called NoHo Printing & Graphics. That business became a staple of the community: Throughout the area, one could find many stores featuring his signs, and school groups frequently sought his services for T-shirt design. Mr. Pena hoped that one day he could pass his shop on to his son.

On August 3, 2022, Mr. Pena was working in his store when he heard a commotion outside. When he opened the door to investigate, he saw a man running towards him, pursued by law-enforcement officers. The man struck Mr. Pena on the shoulder, tossed him out of his shop, and barricaded himself inside. The officers told Mr. Pena to step back,

---

Clause for enforcement of the "police power." While the district court erred in answering that question in the affirmative, its recitation of this case's "Factual and Procedural Background" is correct. *See* ER-7-9. Therefore, Mr. Pena provides citations to the record sparingly—that is, without providing citations for "undisputed facts offered only for general background." 9th Cir. R. 28-2.8.

and Mr. Pena watched the scene unfold from afar—for the next thirteen hours.

Eventually, a Los Angeles SWAT team arrived on the scene and took over. A couple of hours later, the team assaulted the shop, firing dozens of teargas cannisters into the structure. When the police entered Mr. Pena's shop, they found that the fugitive had somehow escaped.

The gas damage was extensive. It destroyed essentially all of Mr. Pena's delicate printing equipment and inventory, and it rendered his shop uninhabitable absent a HAZMAT cleanup. Mr. Pena's insurance policy, as is common, does not cover property loss caused by authorized acts of government.[2] In total, Mr. Pena estimates that the gas caused at least sixty thousand dollars of damage to his inventory and equipment—a price tag that Mr. Pena simply cannot afford.

When the City's police officers ordered the assault on Mr. Pena's shop, they were under the impression that the government would pay

---

[2] *See* Jordan R. Plitt et al., 10A Couch on Insurance § 152:22 (3d ed. 2022) (noting that loss associated with authorized acts of government is "typically excluded from most property insurance policies").

Mr. Pena for the damage. ER-31-37; ER-38-68. Immediately after the assault, they told Mr. Pena not to worry, that he should just file a claim. However, the police officers were sadly mistaken: Despite Mr. Pena's repeated pleas, the City has not provided him a dime.

Mr. Pena could not afford to repair or replace his equipment, so he has been operating out of his garage. His volume is severely limited, given that all he has is a second-hand printer that a generous individual sold him at a steep discount. Moreover, his location is far from optimal: Mr. Pena's garage lacks air conditioning, and he no longer attracts walk-in customers. Accordingly, with each passing day that the City refuses to provide Mr. Pena compensation, Mr. Pena is losing considerable income and business value. This is an unsustainable financial situation that, unless rectified by this court, might result in the Penas having to sell their home. In short, Mr. Pena's life's work is disappearing before his eyes.

Mr. Pena does not fault the City's officers for assaulting his shop; nevertheless, when governmental agents intentionally or foreseeably destroy an innocent person's property to achieve a public good, the public has a constitutional duty to provide Just Compensation. Thus,

once it became clear that the City would not pay Mr. Pena absent a court order, Mr. Pena filed this lawsuit seeking Just Compensation, as well as Section 1983 damages flowing from the City's continued failure to provide Just Compensation.

The district court at first appeared to agree with Mr. Pena's theory of the case. The City filed a motion for judgment on the pleadings, arguing that Mr. Pena's complaint fails as a matter of law because, in the City's view, the Just Compensation Clause carries an implicit, categorical exception for property taken pursuant to a valid exercise of the "police power." ER-72-82. The district court (properly) denied that motion. ER-69-71. However, after discovery, the district court proceeded to deny Mr. Pena's motion for summary judgment on the very theory that the court had previously rejected— that there is indeed an implicit, categorical exception to Just Compensation for enforcement of the "police power." ER-10-14. The court did so without acknowledging *any* of the cases supporting Mr. Pena's position. In light

of that ruling, the parties stipulated to judgment, and Mr. Pena timely appeals.[3]

## SUMMARY OF ARGUMENT

The district court found that, although the Just Compensation Clause requires payment when government foreseeably damages property for the public good, the Clause carries an implicit, categorical exception that applies to this case. Specifically, the court found that there is an exception to the Just Compensation Clause for enforcement of the "police power." The court was able to issue that opinion only by completely ignoring Mr. Pena's briefing—which provided a mountain of binding Supreme Court precedent to the contrary. Indeed, the court did not so much as cite any of that precedent. Yet such precedent, as explained below, demonstrates that Mr. Pena prevails in this case.

This brief proceeds in four parts. First (I), Mr. Pena has sufficiently alleged a *prima facie* Just Compensation claim. For at least 150 years, the Supreme Court has recognized that governmentally authorized property damage implicates the Just Compensation Clause.

[3] The City did not file a cross-motion for summary judgment, presumably because unless the court reconsidered its prior decision, such a motion would have been futile.

The usual test asks whether the government (1) caused the property damage, (2) intentionally or foreseeably, (3) for a public benefit. If so, the government must pay for the damage—absent extremely limited exceptions which no one has argued apply here. In this case, it is beyond dispute that the test is satisfied.

Second (II), the City bears the burden, using history and tradition, to prove that an exception to the Just Compensation Clause exists and applies. In this case, the City has provided no historical evidence supporting its position. The likely reason is because there is no such evidence: The best historical analogue to this case is the military (standing police forces did not exist at the founding of this country), and it is long accepted that the Just Compensation Clause applies to the military.

Third (III), Supreme Court doctrine forecloses the possibility of an exception to Just Compensation for the police-power. The Supreme Court has repeatedly opined—in an unbroken line of precedent lasting more than a century—that takings of property are not subject to "uncompensated qualification under the police power." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (quoting *Pa. Coal Co. v.*

*Mahon*, 260 U.S. 393, 415 (1922)). For this reason, other circuits have properly observed "[t]hat Government actions taken pursuant to the police power are not per se exempt from the Takings Clause is axiomatic in the Supreme Court's jurisprudence." *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir. 2021). The district court, in applying a "police power" exception to this case, did not acknowledge any of this precedent.

Fourth (IV), the decision in *Baker v. McKinney*, 84 F.4th 378 (5th Cir. 2023) cannot support the district court's holding. The district court cited *Baker* approvingly. But *Baker* squarely rejected a "police power" exception and, instead, found a narrower "necessity exception" to the Just Compensation Clause. The district court did not acknowledge that distinction, and, in any event, *Baker*'s "necessity exception"—which the *Baker* panel found *sua sponte*, without any assistance of adversarial briefing—cannot be reconciled with history or binding precedent.

Governmental agents intentionally destroyed Mr. Pena's property while chasing a fugitive. Apprehending a fugitive is a valuable good, no doubt, but it is a public good whose costs must, "in all fairness and justice, [] be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

The district court gravely erred by holding to the contrary; accordingly, its judgment should be reversed.

## STANDARD OF REVIEW

This appeal presents a question of law, without any material factual disagreement between the parties. Accordingly, this Court's review of the district court's judgment is *de novo*. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

### I. Mr. Pena has sufficiently alleged a Just Compensation claim.

#### A. Under the Just Compensation Clause, intentional (or foreseeable) property destruction is no different from appropriation.

The Supreme Court has consistently held that when the government intentionally or foreseeably destroys private property for public purposes, it is a taking, just as if the government formally condemned an interest in the property. *See Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (11 Wall.) 166, 181 (1872) ("[W]here real estate is actually invaded . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution."). In *Pumpelly*, the government erected a dam that flooded the plaintiff's

property. *Id.* at 167. The government, like the City in this case, "argue[d] that the damages of which the plaintiff complain[ed] [were] such as the State had a right to inflict . . . without making any compensation for them." *Id.* at 176. The Supreme Court disagreed:

> It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use.

*Id.* at 177–78 (emphasis in original). That holding could hardly be clearer: Destroying property is the same as taking possession of it, and any argument that hinges on supposed differences between destruction and appropriation is a non-starter.

*Pumpelly* is not an aberration or a moribund precedent. The Supreme Court continues to cite it approvingly, repeatedly affirming that property damage is akin to physical appropriation and, therefore, implicates the Just Compensation Clause. *See, e.g.*, *Ark. Game & Fish*

*Comm'n v. United States*, 568 U.S. 23, 32 (2012) (citing *Pumpelly*); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010) (plurality) ("[W]hen the government uses its own property in such a way that it destroys private property, it has taken that property") (citing *Pumpelly*); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 316–17 (1987) (citing *Pumpelly*); *Armstrong*, 364 U.S. at 48–49 ("[T]he Government's action did destroy them and in the circumstances of this case did thereby take the property value of those liens within the meaning of the Fifth Amendment."); *United States v. Causby*, 328 U.S. 256 (1946) (finding that low-level overhead flights caused property damage warranting compensation); *United States v. Cress*, 243 U.S. 316 (1917). These sorts of physical appropriations constitute the "clearest sort of taking." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). As such, courts "assess them using a simple, *per se* rule: The government must pay for what it takes." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)).

Moreover, the Supreme Court has explicitly stated that *Pumpelly* (and its progeny) are not limited to property damage caused by flooding. To wit, there is no "'flooding-is-different' rule," given that "[t]here is [] no solid grounding in precedent for setting flooding apart from *all* other government intrusions on property." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) (emphasis added). *Pumpelly* is good law, and it establishes a universal rule that property damage or destruction is the same as appropriation.

The City has no answer to *Pumpelly*. Below, the City argued that *Pumpelly* "should be disregarded" because it "is an eminent domain case" whereas this one is not. ER-27-28. But *Pumpelly* was not an "eminent domain case"; it was an inverse-condemnation case—just like this one—brought by a property owner who asserted that the government "took" his property by causing damage to it. *Pumpelly*, 80 U.S. at 176. *See also Knick v. Township of Scott*, 588 U.S. 180, 186 (2019) (explaining that "[i]nverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant" (quotation marks omitted)). Unfortunately (and without explanation),

it appears the district court indeed "disregarded" *Pumpelly*; its opinion never mentions it or any of the cases building on it. This Court should not make the same mistake.

### B. Mr. Pena has sufficiently alleged that the government intentionally (or foreseeably) destroyed his property for a public benefit (capturing a fugitive).

To maintain a claim seeking Just Compensation for property damage, the plaintiff must sufficiently allege that the government (1) caused property damage, (2) intentionally or foreseeably, (3) for the public use or benefit. Mr. Pena easily meets that standard.

**Causation.** To trigger its obligation to pay, the government must have actually caused the property damage or destruction. Often (as in this case), this will be obvious—such as when low-level aircraft render a chicken farm inoperable. *Causby*, 328 U.S. at 266. In other cases, the causal chain might be inadequate, *see Armstrong*, 364 U.S. at 48 (listing cases), or the property's destruction might have been inevitable, *see, e.g.*, *YMCA v. United States*, 395 U.S. 85, 97 (1969) (Harlan, J., concurring) ("[I]f the military reasonably believed that the rioters would have burned the building anyway, recovery should be denied[.]").

Flooding cases demonstrate the causal connection required for finding that a compensable taking has occurred. In one case where a property owner argued that a newly constructed governmental canal had flooded and damaged the his property, the Court denied a Just Compensation claim in part because "the property was subject to seasonal flooding prior to the construction of the canal, and the landowner failed to show a causal connection between the canal and the increased flooding, which may well have been occasioned by changes in weather patterns." *Ark. Game & Fish Comm'n*, 568 U.S. at 34 (citing *Sanguinetti v. United States*, 264 U.S. 146, 149 (1924)). By contrast, when the record clearly shows that the government caused flood damage by constructing a dam that raises water above its natural level, owners are due compensation for the taking. *United States v. Cress*, 243 U.S. 316, 328 (1917); *see also Ark. Game & Fish Comm'n*, 568 U.S. at 36 (refusing "to adopt a 'flooding-is-different' rule").

There is no dispute that the City's officers caused damage to Mr. Pena's equipment and inventory when they fired chemical munitions into his shop. Likewise, there is no suggestion that the fugitive would have caused such damage himself (and, in any event, the fugitive had

already escaped by the time the City's officers assaulted the shop). *Cf. YMCA*, 395 U.S. at 92 ("The YMCA building was on fire from Molotov cocktails being thrown from [third-party rioters]." (internal quotation marks omitted)).

**Intentional or Foreseeable**. "Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action." *Ark. Game & Fish Comm'n*, 568 U.S. at 39 (citing *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921)). Again, it is obvious in this case that the City's officers intended, or at the very least could have foreseen, the damage they caused to Mr. Pena's property.

A recent Fourth Circuit case provides an illustrative contrast. In *Yawn v. Dorchester County*, the government conducted an aerial mosquito-spraying operation that allegedly killed the claimant beekeepers' bees. 1 F.4th at 192. Although the Fourth Circuit agreed that the spraying operation was an exercise of the police power that *could* lead to a compensable taking, it denied the claim because "the death of [plaintiffs'] bees was neither intentional nor foreseeable." *Id.* at 194–95. In particular, the government had taken significant and

"specific measures to avoid the unfortunate death of the bees"—measures that had been successful in the past. *Id*. at 195. *See also id*. at 193, 196 (noting that, prior to spraying, "the County issued a press release . . . to numerous media outlets, including local television stations, newspapers, radio stations, and social media platforms," and it provided the pilot with a map of all known "beehives so that he could turn off the sprayer when flying over those locations"). There was no reason, under such circumstances, to expect that this time the spraying operation would lead to the death of any bees, so the court held that there was no compensation due.

In this case, it was eminently foreseeable that the assault on Mr. Pena's shop would cause property damage. The officers fired dozens of teargas cannisters into the shop, saturating the property and all its contents with noxious chemicals. Of course, the officers' motivation was not to cause damage for damage's sake; nevertheless, they acted with

the certain knowledge that they were risking property damage to innocent parties.[4] ER-40-41.

**Public Use**. Finally, a compensable taking must have been for the "public use." Generally speaking, the question is whether the destructive act itself was lawful. *See Ark. Game & Fish Comm'n*, 568 U.S. at 39 ("invasion [must be] the foreseeable result of authorized government action"). There is no dispute in this case that the City's officers acted lawfully when they assaulted Mr. Pena's shop. *See Steele v. City of Houston*, 603 S.W.2d 786, 791–92 (Tex. 1980) ("public use" requirement satisfied when "the City ordered the destruction of the property because of real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house").[5]

---

[4] At the time of the assault, the City's officers were under the impression that Mr. Pena would receive governmental compensation. ER-41-42.

[5] If the destruction were illegal, then Mr. Pena would have a different claim. *See Hernandez v. City of Lafayette*, 643 F.2d 1188, 1200 n.26 (5th Cir. Unit A May 1981) ("[T]he landowner whose property is . . . 'taken' albeit not for 'public use' will nevertheless have a damage cause of action under § 1983 since such a 'taking' would constitute the deprivation of property without due process of law under the Fourteenth Amendment."); *cf. Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) ("[I]f a government action is found to be

## II. The City has the burden to establish an exception to the Just Compensation Clause using history—and it cannot do so.

Because Mr. Pena has adequately pleaded a *prima facie* claim for Just Compensation, the City bears the burden of demonstrating an applicable exception. To meet that burden, the City would have to provide historical evidence sufficient to overcome the Fifth Amendment's text. The City has made no attempt to make that showing—which is unsurprising, given that there is no such historical evidence.

### A. The City has pointed to no historical evidence supporting an applicable exception to the Just Compensation Clause.

The Just Compensation Clause provides: "nor shall private property be taken for public use, without just compensation." It does not say, "unless the taking was pursuant to the police power." *See Knick*, 588 U.S. at 189 ("The Clause provides: '[N]or shall private property be taken for public use, without just compensation.' It does not say: 'Nor shall private property be taken for public use, without an

impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.").

available procedure that will result in compensation.'"). It does not exempt particular power but rather "constrains the power of each 'State' as an undivided whole." *Sheetz v. County of El Dorado*, 601 U.S. 267, 276 (2024) (finding significant that the Clause "speaks in the passive voice"). Accordingly, the City bears a heavy burden to present historical evidence demonstrating that, notwithstanding the Just Compensation Clause's clear command, an exception applies here. Yet the City has made no attempt to do so.

Two years ago, the Supreme Court explained that the government must prove any exception to enumerated constitutional rights using deeply rooted history and tradition:

> When [a Bill of Rights provision's] plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition . . . . Only then may a court conclude that the individual's conduct falls outside the [provision's] unqualified command.

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022) (citation and quotation marks omitted). Although *Bruen* specifically concerned the scope of the incorporated Second Amendment, the Court explained that "[t]his Second Amendment standard accords with how

we protect other constitutional rights." *Ibid*. Thus, "when the plain text of a constitutional provision establishes an individual right—here, the right to compensation for confiscated property—it *is the government's burden* to demonstrate a historically grounded exception." *Baker v. City of McKinney*, 93 F.4th 251, 253 (5th Cir. 2024) (Elrod and Oldham, JJ., dissenting from denial of rehearing en banc) (emphasis in original).

The City did not even attempt to argue that history and tradition supported a police-power exception. Likewise, the district court failed to discuss any history or tradition supporting its holding. Instead, at the City's urging, the district court followed out-of-circuit cases, largely unpublished, that themselves did not rely on history or tradition. *See* ER-10-14.

### B. The best historical analogue for modern policing is the military—which is unquestionably subject to the Just Compensation Clause.

The City's failure to ground its argument in history is understandable—because there is no historical evidence supporting its position. Finding a historical analogue for this case is difficult, for a simple reason: There were no professional police forces in this country until decades after the founding and, even then, police agencies did not

adopt destructive tactics until the late twentieth century. Nevertheless, the founding generation was well acquainted with the concept of armed governmental agents depriving innocent individuals of their property for the public good—because that's what the army did during the American Revolution. As the Supreme Court has recognized, the Just Compensation Clause is aimed precisely at these sorts of actions.

Colonial towns had no police but, instead, inherited the "night watch" system—a British practice dating to the tenth century—wherein ordinary citizens would keep an eye out for trouble and sound an alarm if necessary. *The Role of Police in American Society: A Documentary History* 3, 6 (Bryan Vila & Cynthia Morris eds., 2019). Watchmen received no pay, and "every able-bodied man of the town was required to take a turn or hire a substitute." *Id*. at 6. Towns would elect a constable to oversee this process and act as a kind of "chief colonial law enforcement officer[]," but these constables, likewise, were generally "unpaid and untrained." *Id*. at 4. Essentially, communities policed themselves—a system that worked well enough, at least when Philadelphia's entire population was merely a few thousand. *See id*. at 2.

During this period, any damage caused to private property by law enforcement would have been rare and minor. For one thing, the "common-law knock and announce principle" prohibited an officer from breaking down a door "unless he first signify to those in the house the cause of his coming, and request to give them admittance." *Wilson v. Arkansas*, 514 U.S. 927, 932 (1995) (cleaned up). In those rare situations where force was necessary, the property owner would likely have been responsible for unlawfully refusing to open the door (negating any claim for just compensation). And even if the property owner were not responsible, the damage would have been little more than a splintered door jamb. The historical record simply does not tell us what happened in those rare circumstances, which is not surprising—a splintered door jamb is not likely to lead to litigation. *See Sandford v. Nichols*, 13 Mass. 286, 289–90 (1816) (suggesting that the damage caused by an unlawful search would be "very small" and that it may not be "worth their while" to litigate).

During the first half of the nineteenth century, America's population exploded—and the old night watch system became increasingly untenable. Hundreds of thousands of immigrants from

northern and central Europe settled in the new country between the years of 1790 and 1820, and cities started looking more like collections of diverse communities rather than a single, monolithic one. *Role of Police*, *supra*, at 25. Such growth accelerated and, by 1860, New York City alone claimed more than one million residents (in 1790, that number was thirty-three thousand). *Ibid.* Under changed circumstances, the night watch system fell into widespread abuse or proved ineffective, often giving way to mob violence or, especially in rural areas, ad hoc vigilante groups. *Ibid.* However, advocates for professional police forces "were unable to overcome the long-standing American aversion to anything resembling a standing army—an aversion dating to the abuses of Cromwell's constabulary in seventeenth-century England and reinforced by the Redcoats' behavior prior to the Revolution." *Ibid.*

Thus, the shift to professional police forces began across the Atlantic. In 1829, Home Secretary Robert Peel convinced Parliament to create a "Metropolitan Force." (the slang terms "bobby" and "peeler," which remain in use today, are references to Peel). *Id.* at 30–31. The Metropolitan Force "replaced [London's] night watch and various

independent local forces" with "a full-time, day and night operation composed of more than 3,000 salaried officers," organized to be "quasi-military in structure" and maintain public order in an increasingly industrialized urban environment. *Id*. at 31. Eventually, major American cities followed London's lead—starting in 1845, with New York City. *Id*. at 35. Still, Americans were reluctant to embrace the concept of a standing, public police force, which partly explains the substantial role played by private police agencies (such as the Pinkertons) in the late nineteenth and early twentieth centuries. *See id*. at 40.

To placate fears of military rule, early police officers were supposed to be either unarmed or lightly armed—though this, too, would prove untenable. "For example, in 1857 New York, police officers officially were armed only with billy clubs." *Id*. at 113. However, increased (and often factional or gang-related) violence meant that, in practice, officers often carried firearms—with the tacit approval of their superiors, who feigned ignorance to the public. *Ibid*. The result was the worst of both worlds: Government armed its police officers but did not train them in using those arms. *Ibid*.

The twentieth century therefore saw a second shift—toward military-style policing. In response to organized crime (particularly in the Prohibition era), cities began officially supplying their police officers with firearms and firearms training. *Ibid*. Nevertheless, police departments struggled to handle the extraordinary unrest of the 1960s, including the Watts Riots in Los Angeles. *See id*. at 176. Thus, in 1969, Los Angeles police formed a "Special Weapons and Tactics" (SWAT) team, whose training would be based on the U.S. Marines' experience with "counterinsurgency operations and guerrilla warfare" in the Vietnam War. Karan R. Singh, Note, *Treading the Thin Blue Line: Military Special-Operations Trained Police SWAT Teams and the Constitution*, 9 Wm. & Mary Bill Rts. J. 673, 676 (2001). Over the next few decades, thousands of other American cities followed suit. *Id*. at 677 n.34. In a key break with previous forms of policing, these SWAT teams "often carry high-destruction weaponry." *Id*. at 680. Thus, assaults like the one on Mr. Pena's shop are less reminiscent of traditional policing and more akin to "the use of military tactics against civilians." *Id*. at 687.

The best historical analogue for this case, therefore, would be takings committed by the military—which are unquestionably subject to the Just Compensation Clause. St. George Tucker, the earliest commentator on the U.S. Constitution, wrote that the Clause "was probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressments, as was too frequently practiced during the revolutionary war, without any compensation whatever." St. George Tucker, 1 *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 305–06 (1803). John Jay had complained about such seizures in 1778. *See* John Jay, *A Freeholder, A Hint to the Legislature of the State of New York* (1778), *reprinted in* 5 *The Founders' Constitution* 312. Keep in mind that these takings were committed during not only an emergency, but an existential national crisis—our nation's very independence—yet even then, the Constitution's ratifiers agreed that the public must give compensation. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 359 (2015) ("[E]arly

Americans bridled at appropriations of their personal property during the Revolutionary War, at the hands of both sides.").

Indeed, by the time of this country's founding, it was widely accepted that a nation's military may damage private property during wartime—but "[s]uch damages are to be made good to the individual, who should bear only his quota of the loss." Emer de Vattel, *The Law of Nations*, bk. III, ch. 15, § 232, at 617 (Béla Kapossy & Richard Whatmore eds., Thomas Nugent trans., Liberty Fund 2008) (1758)). Vattel was quite familiar to the Framers. In fact, George Washington famously borrowed a copy of *The Law of Nations* from the New York public library in 1789 and never returned it. (The library waived his late fees in 2010.) *See George Washington's Library Book Returned 221 Years Late*, Reuters (May 20, 2010).[6]

In sum, history suggests that the Just Compensation Clause must apply to destructive acts taken by armed governmental agents—whether they be police officers, military officers, or any other governmental officer. Accordingly, the City would not have been able to

---

6 https://www.reuters.com/article/us-book-library-washington-idCATRE64J1ZV20100520.

carry its burden, even if it had tried.

## III. Binding precedent forecloses anything like a "police power" exception to the Just Compensation Clause.

In any event, the Supreme Court has already answered this question. The Just Compensation Clause demands payment for all property "taken," irrespective of the interest being served by the taking. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005). Accordingly, the Supreme Court has repeatedly explained that there is no exception allowing "uncompensated qualification under the police power." *Lucas*, 505 U.S. at 1014 (quoting *Pa. Coal*, 260 U.S. at 415). In holding otherwise, the district court disregarded such binding precedent and, instead, blindly followed out-of-circuit, largely unpublished decisions that likewise misread or ignored the Supreme Court.

### A. The Supreme Court has repeatedly disavowed any "police power" exception to the Just Compensation Clause.

The district court is not the first court to hold that the Just Compensation Clause does not apply to enforcement of the police power; decades ago, before getting reversed by the Supreme Court, the South Carolina courts held that "exercise[s] of the police power" are

"noncompensable." *Lucas*, 505 U.S. at 1026. Such reasoning is just as mistaken today as it was then. The Supreme Court explained that "[o]ur cases provide no support for this." *Ibid.*

It makes no difference that the City damaged Mr. Pena's property while enforcing its police power. An act might well be "within the State's police power . . . . ***It is a separate question, however***, whether an otherwise valid [exercise of the police power] so frustrates property rights that compensation must be paid." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982) (emphasis added). Of course, "the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, [but] the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *First English*, 482 U.S. at 316. To illustrate that very principle, the *First English* Court cited *Pumpelly*, which, as described above, involved foreseeable destruction of property. *Id.* at 316–17.

It is therefore nonsensical in an inverse-condemnation case to distinguish between the "police power" and the "eminent domain"

power—they are both different ways the government may achieve legitimate ends, and, in any instance, Just Compensation must be paid for all property "taken." *See Sheetz*, 601 U.S. at 276 (explaining that the Takings Clause "speaks in the passive voice" and does not "var[y] according to the branch of government effecting the expropriation" (citation omitted)). This is why other circuits have properly observed it "is axiomatic in the Supreme Court's jurisprudence" that the "actions taken pursuant to the police power are not per se exempt from the Takings Clause." *Yawn*, 1 F.4th at 195; *see also John Corp. v. City of Houston*, 214 F.3d 573, 578–79 (5th Cir. 2000) ("[S]imply because the City did not formally use its powers of eminent domain to destroy Appellants' property does not mean that its actions could not amount to a taking requiring just compensation.").

To be sure, government need not compensate owners every time an exercise of the police power arguably affects property. For example, no compensation is due when government, pursuant to its police power, prohibits an owner's "noxious use of [] property [that would] inflict injury upon the community," *Mugler v. Kansas*, 123 U.S. 623, 669 (1887), or when it acquires property through the owner's unclean

hands, *Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (owner's use of car to commit a crime subjected it to forfeiture, notwithstanding co-owner's innocence); *cf. Horne*, 576 U.S. at 358 ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home"). Nor must the government give compensation for property damage caused while *defending* the claimant's property from even greater damage, in an action that only "incidentally [] benefit[s] the public." *YMCA v. United States*, 395 U.S. 85, 92 (1969). But just because government is not "liable under the Just Compensation Clause to property owners *every time* policemen" damage property, *ibid.* (emphasis added), it does not follow that it is *never* liable. Indeed, it cannot follow—so long as there is protection for private property in this country. *Lucas*, 505 U.S. at 1014.

If there were something like a "police power" exception to the Just Compensation Clause, that would surely be relevant in a case involving damage inflicted during a firefight with rioters—yet not a single member of the Court even mentioned it. *See YMCA*, 395 U.S. 85. In *YMCA*, federal troops occupied a YMCA building in the Panama Canal zone during a riot, defending it from attackers who wielded

Molotov cocktails and firearms. *Id.* at 87. The YMCA brought a Just Compensation claim for damage the building suffered. A majority of the Supreme Court held that the owner could not recover because the army's purpose in occupying the building was specifically to protect the property from the rioters (with only "incidental[]" benefit to the public), making the owner the "particular intended beneficiary" of the government action. *Id.* at 92. Justice Harlan, concurring, said the result would have been different if there were any evidence that the government activity caused more damage than it prevented. *Id.* at 94–95. Meanwhile, the dissenting justices merely disagreed about the record. *Id.* at 99. At bottom, every member of the Court agreed that if the army had *not* been acting primarily to protect the property from greater damage, there would have been a valid Just Compensation claim.

Indeed, property damaged is property "taken"—even if the governmental agents who ordered and carried out the destruction happened to be wearing a badge. "The essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the

government has physically taken property for itself or someone else—*by whatever means*[.]" *Cedar Point*, 594 U.S. at 149 (emphasis added).

To be clear, the gravamen of Mr. Pena's complaint is not the mere entry onto his property but, instead, the destruction of it. No one suggests that Mr. Pena would be owed Just Compensation for an isolated, benign entry—if, say, the City's officers "park[ed] on [Mr. Pena's] vacant land to eat lunch" one day. *Id.* at 160. However, the reason for that is because an isolated, non-destructive entry does not appropriate the owner's right to exclude; it is not the functional equivalent of an easement. *Id.* at 160–61. By contrast, property *destruction* does appropriate property—even if it occurred as part of a "temporary" invasion, *id.* at 160. Put another way, Mr. Pena has suffered the permanent loss of his equipment and inventory—not merely a momentary frustration of his right to exclude people from the premises of his shop.

*Cedar Point* confirms Mr. Pena's position. There, the Court analyzed a California regulation that allowed uninvited union organizers to enter private farms sporadically. *Id.* at 144. The majority found that to constitute a *per se* taking, whereas the dissent suggested

a different approach for invasions that are not permanent. *Id*. at 152; *id*. at 168 (Breyer, J., dissenting). All nine justices agreed that, in cases where property is *damaged* pursuant to an authorized invasion, a *per se* takings approach is correct. *See id*. at 150 (majority op.); *id*. at 172 (Breyer, J., dissenting). This makes sense: Damage to property is permanent until the property is either repaired or replaced.

### B. In applying a "police power" exception, the district court followed non-binding, largely unpublished circuit cases that ignored or misread the Supreme Court.

The district court ignored the foregoing mountain of binding precedent and, instead, followed non-binding decisions from other circuits, many of which are unreported and do not discuss or even cite any of the controlling Supreme Court precedents. Those decisions—like any decision upholding an exception to Just Compensation that could apply in this case—cannot be reconciled with binding precedent.

Primarily, the district court relied on the approach epitomized in *Lech v. Jackson*, 791 F. App'x 711 (10th Cir. 2019), a case with materially identical facts as this one. ER-11-13. *Lech*, being unpublished, is "not precedential" even in its home circuit. 10th Cir. R. 32.1(A); *see also Teva Pharms., USA, Inc. v. Weiser*, No. 1:23-cv-02584-

DDD-SKC, 2023 WL 9425674, at *6 (D. Colo. Dec. 27, 2023) ("*Lech* is an unpublished decision and therefore not binding authority[.]"). More importantly, neither it nor any other categorical exception for exercises of the police power can be reconciled with binding precedent from the Supreme Court.

**First**, *Lech* rested on a key misreading of Supreme Court precedent. At bottom, it relied on the Supreme Court's observation that "when the state acts to preserve the 'safety of the public,' the state 'is not, and, consistent[] with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate [affected property owners] for pecuniary losses they may sustain' in the process." *Lech*, 791 F. App'x at 717 (quoting *Mugler*, 123 U.S. at 669). That quotation, however, is critically truncated: To continue the quoted Supreme Court passage, "the state [need not] compensate [] individual owners for pecuniary losses they may sustain, *by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community*." *Mugler*, 123 U.S. at 669 (emphasis added).

Thus, the Supreme Court case on which *Lech* purported to rely does not endorse a "police power" exception to the Just Compensation

Clause. Instead, the Court expressly addressed "[t]he exercise of the police power by the destruction of property *which is itself a public nuisance*." *Ibid.* (emphasis added). By omitting such patently relevant language from *Mugler*, the Tenth Circuit panel erroneously transformed a completely anodyne statement of law (it is not a regulatory taking when the government tells property owners they may not cause a nuisance) into a sweeping exception from Supreme Court doctrine—a categorical exception that, as described above, is not only unsupported by intervening Supreme Court precedent but expressly forbidden by it. *See Lucas*, 505 U.S. at 1026.

**Second**, *Lech* (and the district court below) relied on a Federal Circuit case that also cannot be reconciled with Supreme Court precedent. In *AmeriSource*, the Federal Circuit took the Supreme Court (in *Bennis v. Michigan*) as "suggest[ing] that so long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1154 (Fed. Cir. 2008); *see also Bennis v. Michigan*, 516 U.S. 442 (1996); ER-12-13 (citing *AmeriSource* and

*Bennis*). But precedent from both before and after *Bennis* (and after *AmeriSource*) demonstrates that that observation simply cannot be correct. *See Horne*, 576 U.S. at 361 (finding the government's direct appropriation of a farmer's raisin crop to be "a clear physical taking"); *Loretto*, 458 U.S. at 425–26 (finding an otherwise valid exercise of "the State's police power" to be a taking requiring compensation). And other circuits recognize that the Federal Circuit's broad statement is not correct.[7] *See, e.g.*, *Yawn*, 1 F.4th at 195 (4th Cir.); *John Corp.*, 214 F.3d at 578–79 (5th Cir.). Again, "the entire doctrine of inverse condemnation" depends on the notion that police-power actions are not categorically exempt from a takings analysis. *First English*, 482 U.S. at 316.

The best explanation for the Federal Circuit's statement in *AmeriSource* is that the panel severely misread *Bennis*. In *Bennis*, the

---

[7] Perhaps recognizing that *AmeriSource* is at variance with Supreme Court precedent, the Federal Circuit has recently narrowed that holding by stating that "[w]hile the United States' police power may insulate it from liability for an initial seizure, there is no police power exception that insulates the United States from takings liability for the period after seized property is no longer needed." *Jenkins v. United States*, 71 F.4th 1367, 1373 (Fed. Cir. 2023).

Supreme Court considered whether compensation was owed for property that had been "transferred by virtue of [a forfeiture] proceeding from petitioner to the State." 516 U.S. at 452. Holding against the claimant, the Court stated that "[t]he government may not be required to compensate an owner for property *which it has already lawfully acquired* under the exercise of governmental authority other than the power of eminent domain." *Ibid.* (emphasis added). That stands for nothing more than the notion that, other than in eminent domain, no compensation is generally due when government acquires title to property by virtue of a lawful, formal proceeding (such as forfeiture). And *even then*, the government still may owe Just Compensation. *See Tyler v. Hennepin County*, 598 U.S. 631 (2023) (government committed a taking by retaining surplus in tax foreclosure sale).

Indeed, *Bennis* relied not on principles of Just Compensation but, instead, on forfeiture—specifically, the uncompensated seizure of property utilized as part of a criminal enterprise. *See Van Oster v. Kansas*, 272 U.S. 465, 469 (1926) (seizure of "vehicle[] used in unlawful transportation of liquor"); *Dobbins's Distillery v. United States*, 96 U.S.

395, 397 (1878) (seizure of "a distillery" and the items necessary to run it, which was illegal at the time); *The Palmyra*, 25 U.S. (12 Wheat.) 1, 13 (1827) (seizure of pirates' vessel). In those cases, the government need not compensate owners prior to seizing their property because the property was considered dangerous and constituted criminal evidence, and their loss to the owner furthered punitive and remedial goals. *The Palmyra*, 25 U.S. at 15. Similar considerations would apply if, say, the fugitive had barricaded himself inside *his own* house and later sought compensation for the assault to apprehend him—after all, that would hardly be "Just" Compensation.

Forfeiture is a poor analogue because it holds a peculiar—and uneasy—place in our nation's history and jurisprudence. *See Bennis*, 516 U.S. at 453–55 (Thomas, J., concurring). Multiple justices have suggested that our current forfeiture practices may not be constitutional. *Culley v. Marshall*, 144 S. Ct. 1142, 1153 (2024) (Gorsuch, J., concurring) ("I [] agree with the dissent that this case leaves many larger questions unresolved about whether, and to what extent, contemporary civil forfeiture practices can be squared with the Constitution's promise of due process."); *id.* at 1159 (Sotomayor, J.,

dissenting). Yet forfeiture at least has *some* historical pedigree, *Bennis*, 516 U.S. at 454 (Thomas, J., concurring) (noting historical practices around the time of ratification of both the Fifth and Fourteenth Amendments), whereas uncompensated destruction of private property has none. And even under forfeiture, courts recognize an exception at the very least when property "is used without the owner's consent"—as it was in this case. *Id.* at 448 n.5 (citation omitted). Presumably, that is why the City has not suggested that it could have ordered the forfeiture of Mr. Pena's equipment and inventory without compensating him. Accordingly, its destruction of that property demands Just Compensation.

**Third**, *Lech* erroneously assumed that actions taken pursuant to the police power are not for the "public use," as contemplated by the incorporated Fifth Amendment. *See Lech*, 791 F. App'x at 716–17. There are multiple problems with that assumption.

First, accepting such reasoning would require accepting that the SWAT action itself was unlawful. The Takings Clause allows the government to take property for the "public use," so long as the government provides just compensation. *Lingle*, 544 U.S. at 543. By

contrast, a taking that "fails to meet the 'public use' requirement" is unlawful *even with compensation*. *Ibid*. In other words, if the City took Mr. Pena's property for something other than "public use," it would be liable not only for its failure to pay but also for authorizing the taking in the first place. No one—neither Mr. Pena nor the City—has suggested that the SWAT assault itself was invalid; "[i]t is a separate question, however, whether an otherwise valid [exercise of the police power] so frustrates property rights that compensation must be paid." *Loretto*, 458 U.S. at 425.

Second, the assault on Mr. Pena's shop satisfies even the narrowest conceptions of "public use." In *Kelo*, the Supreme Court was sharply divided over whether government may take property for the purposes of transferring it to a private developer—*i.e.*, whether private economic development satisfies the Fifth Amendment's "public use" proviso.[8] Five members of the Supreme Court answered yes, holding that "public use" has a broad meaning that is synonymous with "public purpose," which includes anything that the government "believes will provide appreciable benefits to the community," even if the immediate

---

[8] The Institute for Justice represented Petitioner Susette Kelo.

effect is to "benefit [an] individual private part[y]." *Kelo v. City of New London*, 545 U.S. 469, 480, 485 (2005). Four Justices dissented, suggesting that "public use" should be interpreted narrowly to mean either "public ownership" or "[made] available for the public's use" (such as by a common carrier). *Id*. at 497–98 (O'Connor, J., dissenting). Even then, however, the dissent acknowledged that there are "circumstances [where,] to meet certain exigencies, takings that serve a public purpose also satisfy the Constitution." *Id*. at 498. Indeed, the City's officers damaged Mr. Pena's property by "using" their equipment—and "when the government uses its own property in such a way that it destroys private property, it has taken that property." *Stop the Beach,* 560 U.S. at 713.

The *Lech* court—and every other court that has recognized anything like a "police power" exception to the Just Compensation Clause[9]—failed to hold the government to any burden of showing

---

[9] The Seventh Circuit, without any further explanation, relied solely on the Federal Circuit's erroneous reading of *Bennis* to find that "actions . . . taken under the state's police power" are exempt from the Just Compensation Clause. *Johnson v. Manitowoc County*, 635 F.3d 331, 336 (7th Cir. 2011). The Third Circuit (in an unpublished opinion) followed *Johnson* in *Zitter v. Petruccelli*, 744 F. App'x 90, 96 (3d Cir.

history supporting such an exception, and failed to address *Loretto*, *Lucas*, *Pennsylvania Coal*, or any of the many cases in which the Supreme Court has squarely rejected it. Likewise, the district court followed suit. This Court should not make that same mistake.

## IV. The Fifth Circuit's decision in *Baker* is at odds with the district court's reasoning—and is otherwise unpersuasive.

The district court opined that the Fifth Circuit's decision in *Baker v. City of McKinney*, 84 F.4th 378 (5th Cir. 2023),[10] supports the conclusion that the Just Compensation Clause categorically exempts enforcement of the police power. ER-11-13. But the district court neglected to mention one key detail: The *Baker* court expressly rejected an exception for "police power" enforcement. Instead, the Fifth Circuit

2018), though a subsequent (published) panel has backed away from that opinion, *Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022) (the continued seizure of evidence after conviction constitutes a taking). Likewise, the Sixth Circuit has walked back its unpublished decision in *Ostipow*. *Compare Ostipow v. Federspiel*, 824 F. App'x 336 (6th Cir. 2020) (granting qualified immunity on the grounds that it was not "clearly established" that the police power is subject to the Just Compensation Clause), *with Bojicic v. DeWine*, No. 21-4123, 2022 WL 3585636, at *8 (6th Cir. Aug. 22, 2022) (rejecting a categorical "police power" exception). *But see* ER-11 (citing *Ostipow* favorably).

[10] *Baker* was argued by the undersigned. Ms. Baker's petition for a writ of certiorari is forthcoming.

invented a different, narrower exception: a "necessity exception." The district court's opinion does not discuss the difference, nor does it address how that might matter in this case.

In any event, *Baker* is unpersuasive. Below, Mr. Pena explains that (A) the *Baker* panel invented its "necessity exception" of its own accord, without benefit of briefing on the subject. For that reason, (B) *Baker* committed major errors and is untenable. In short, just as there is no "police power" exception that could apply here, neither is there a "necessity exception."

### A. The Fifth Circuit rejected a "police power" exception to Just Compensation, then invented a "necessity exception."

*Baker* presented similar facts as this case, with the exception that the fugitive had taken a 15-year-old hostage, who, upon her release (before the eventual SWAT assault), notified the police barricade that the fugitive had terminal cancer and was planning to die in a shootout. *Baker*, 84 F.4th at 380. When Ms. Baker sued for the cost of repairs, the City of McKinney—like the City of Los Angeles in this case—asserted that the Just Compensation Clause categorically exempts property damaged pursuant to "the exercise of the City's police

powers." *Id*. at 383. The panel flatly rejected that assertion, for all the reasons that Mr. Pena articulates in the preceding section of this brief. *Id*. at 383–84.

Yet, after acknowledging that "[Ms.] Baker attends more closely to historical precedent than does the City,"[11] the panel conducted "[its] own analysis of history and precedent" and concluded that there is "a 'necessity' or 'emergency' privilege" that excuses government from its duty to provide Just Compensation. *Id*. at 384–85. Meanwhile, Ms. Baker never had an opportunity to respond to that argument. *See Baker*, 93 F.4th at 251 (Elrod and Oldham, JJ., dissenting from denial of rehearing en banc) ("[W]e find the panel's reasoning unsatisfactory—perhaps unsurprisingly because the panel reached its ostensibly originalist conclusion without the benefit of briefing on the historical

[11] This observation alone should have resolved the case in Ms. Baker's favor, considering that the *government* bears the burden of pointing to history and tradition establishing an exception to constitutional rights. *Baker*, 93 F.4th at 253 (Elrod and Oldham, JJ., dissenting from denial of rehearing en banc); *see also* Argument, *supra* pt. II.

evidence.”).[12]

### B. There is no “necessity exception” to the Just Compensation Clause.

Beyond erroneously placing the burden on the plaintiff to *disprove* a historical exception to a specifically enumerated right, the *Baker* panel committed three major errors. First, it conflated a defense to trespass with a supposed “necessity exception” to the government’s duty of Just Compensation. Second, it ignored Supreme Court doctrine holding that the operative question is whether a property interest has been “taken”—regardless of the importance of committing the taking.

#### *1. Public necessity is a defense against trespass—not an exception to the Just Compensation Clause.*

The *Baker* panel’s fundamental error was confusing a private defense against trespass with a (nonexistent) exception to the government’s duty pursuant to the Just Compensation Clause. To be sure, necessity has a long common-law history as a defense against the tort of trespass. *See* Restatement (Second) of Torts § 197 (private necessity); *id.* at § 196 (public necessity) (“One is privileged to enter

[12] In addition to Judges Elrod and Oldham, Judges Jones, Graves, Ho, and Duncan voted in favor of rehearing en banc.

land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster.").[13] But the strong weight of authority rejects it as a governmental immunity from a duty to pay compensation for a taking of property. That makes sense—the necessity defense to trespass asks whether an interference with property rights is lawful to begin with, not whether compensation is due from the public for an otherwise-lawful taking. *See, e.g.*, *Dayton v. City of Asheville*, 115 S.E. 827, 829 (N.C. 1923) ("Public necessity may justify the taking, but cannot justify the taking without compensation."); *Platt v. City of Waterbury*, 45 A. 154, 162 (Conn. 1900) ("But, however great the necessity may be, it can have no effect on the right to compensation for property taken.").[14]

---

[13] The *Baker* panel also created an (apparently inadvertent) split with both the Federal Circuit and the Texas Supreme Court by treating lack of necessity as an element of a plaintiff's claim, rather than as an affirmative defense that the government must plead and prove. *See TrinCo Inv. Co v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (holding that a "necessity defense is just what it says it is: a defense."); *Steele v. City of Houston*, 603 S.W.2d 786, 792 (Tex. 1980) (same).

[14] The distinction is underscored by the fact that, in cases of private necessity, the defendant is still liable for actual damages—though he cannot be held liable for punitive or nominal damages

Cases from the nineteenth century confirm this understanding of the necessity defense. Indeed, one of the very cases that the *Baker* panel cited to support a necessity exception to Just Compensation actually says precisely the opposite. In 1837, a New York appellate court *affirmed* a decision holding that a plaintiff whose property was destroyed to stop a fire was entitled to governmental compensation. The lower court succinctly explained the distinction between public necessity (an individual defense) and Just Compensation (a public duty):

> *[T]he individual concerned in the taking or destroying of the property is not personally liable*. If the public necessity in fact exists, the act is lawful. Thus, houses may be pulled down, or bulwarks raised for the preservation and defence of the country, without subjecting the persons concerned to an action, the same as pulling down houses in time of fire; *and yet these are common cases where the sufferers would be entitled to compensation from the national government within the constitutional principle* (Const. U. S. Art. 5, of the Amendments).

*City of New York v. Lord*, 17 Wend. 285, 291 (N.Y. Sup. Ct.), *aff'd*, 18 Wend. 126 (N.Y. 1837). (emphases added).

---

because the action itself was lawful. *See* Restatement (Second) of Torts § 197.

Similar decisions abound. The Supreme Court of Georgia—also in a fire-destruction case—squarely held that public necessity is not an exception to Just Compensation:

> [I]n a case of *actual necessity*, to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army, or any other *great public calamity*, the private property of an individual may be *lawfully* taken, and used or destroyed for the relief, protection or safety of the many. And in all such cases, *while the agents of the public who officiate are protected from individual liability, the sufferers are nevertheless entitled, under the Constitution, to just compensation from the public for the loss***.**

*Bishop v. Mayor & City Council of Macon*, 7 Ga. 200, 202 (1849) (emphases added). So too in New Jersey. *Hale v. Lawrence*, 21 N.J.L. 714, 728–29 (1848) ("The right of necessity is the right of individuals, either singly or collectively, in case of overwhelming necessity to invade or destroy private property without positive law. When this right is exercised by government, through and at the discretion of its officers, regulated by law, it becomes the right of eminent domain."). And in South Carolina. *See Jarvis v. Pinckney*, 21 S.C.L. (3 Hill) 123, 140 (1836) ("[A]s the danger to human life was great, it might be destroyed upon the principle that private property may be taken for

the public use[, but] . . . it can only be done upon just compensation. Both the Federal and State constitutions agree[.]).

The U.S. Supreme Court has likewise explained the distinction between "necessity" as a defense to individual liability and the government's categorical duty to provide Just Compensation—on multiple occasions. *See, e.g.*, *United States v. Russell*, 80 U.S. (13 Wall.) 623, 629 (1871) ("[P]rivate rights, under such *extreme and imperious circumstances*, must give way for the time to the public good, but *the government must make full restitution for the sacrifice*." (emphases added)); *Mitchell v. Harmony*, 54 U.S. (13 How.) 115, 134 (1851) ("Unquestionably . . . the government is bound to make full compensation to the owner; but the officer is not a trespasser."); *see also Grant v. United States*, 1 Ct. Cl. 41, 47 (1863) ("taking of private property for use or destruction, when the public exigency demands it, . . . is an exercise of the right of eminent domain").

The evidence is not limited to court decisions. Many founding era declarations of rights even explicitly clarified that necessity is *not* an exception to the principle of Just Compensation. The Northwest Ordinance of 1787 provided that "should the public exigencies make it

necessary, for the common preservation, to take any person's property, or to demand his particular services, full compensation shall be made for the same." The Massachusetts Constitution of 1780 spoke of compensated takings "whenever the public exigencies require" it. And the Vermont Constitution of 1777 speaks of compensated takings "when necessity requires it." These documents and others emphasize that "public necessity," rather than an exception to the Just Compensation Clause, is the quintessential justification for committing a compensable taking: If it's that important for the public to take your property, all the more reason for the public to pay for it enthusiastically.

Indeed, the Just Compensation Clause is squarely aimed at these kinds of emergencies. This is unsurprising, since the founders intended the Clause to apply in context of perhaps the greatest "public necessity" one can imagine—a war for independence on home soil. *See* Argument, *supra* pt. II(B).

We can trace the rule back even further. In 1606, Lord Coke wrote that, when "necessary [for] defence of the realm," the King's agents had the right to invade private property to dig for saltpeter

(used to make gunpowder), just as they could "make bulwarks and trenches upon another's land." Nevertheless, "after the danger is over," the "King's servants must make the places as commodious to the owner as they were before" so that "the owner shall not have prejudice in his inheritance." *The Case of the King's Prerogative in Saltpetre*, 77 Eng. Rep. 1294, 1295 (K.B. 1606).

In the maritime context, the rule goes back even further—to Hammurabi. The "law of general average" has long held that when individuals are forced to sacrifice their property for the common good—for instance, by throwing cargo overboard during a storm—those who benefited from the sacrifice are required to share in the loss. *See, e.g.*, *Columbian Ins. Co. of Alexandria v. Ashby*, 38 U.S. (13 Pet.) 331, 336 (1839).

Going forward to more recent times, there is still no support for the Fifth Circuit's rule. As noted above, the most recent case in which a "necessity" exception to the Just Compensation Clause would have been relevant was *YMCA v. United States*, concerning a riot in the Panama Canal zone where U.S. troops occupied a building and engaged in a firefight with rioters, and the building was subject to damage. *See*

395 U.S. 85. Not a single member of the Court even mentioned the doctrine of necessity. In fact, all four opinions agreed that, if the government *had not* been acting primarily to protect the property at issue (with only incidental benefit to the public), then the government would have been required to compensate owners for any damage it caused—notwithstanding that the damage itself was lawful.

#### 2. A "necessity exception" to Just Compensation is fundamentally at odds with Supreme Court doctrine.

*Baker*'s holding also suffers from a fatal doctrinal flaw: The Just Compensation Clause "focuses directly upon the severity of the burden that government imposes upon private property rights"—not the importance of the governmental interest advanced by the taking. *Lingle*, 544 U.S. at 539. As the Supreme Court has explained:

> [T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property "*for public use*." It does not bar government from interfering with property rights, but rather requires compensation "in the event of *otherwise proper interference* amounting to a taking."

*Id*. at 543 (emphases in original).

A "necessity" exception to Just Compensation thus presents patent absurdities. Two owners could suffer precisely the same burden

on their property rights (say, the destruction of their business); "[i]t would make little sense to say that the second owner has suffered a taking while the first has not," based solely on how "necessary" it was for government to commit the taking (or whether the government happened to be invoking its "police powers"). *Ibid*. Moreover, if the taking *not* be "necessary" to a legitimate public interest, then the taking itself was unlawful. *See id*. at 544. It cannot be that the Just Compensation Clause contemplates only those takings that are necessary, but not *too* necessary.

For that matter, where, precisely, would one find the line demarcating "necessity" warranting an exception to Just Compensation? Should this Court determine the "necessity" of the assault *in toto*? Or should it examine, for example, the "objective necessity" of each round of teargas the City's officers fired (out of more than two dozen)? Does it matter that, in Mr. Pena's case, it turned out that the fugitive had somehow escaped (meaning that, at least in retrospect, the assault on his property can hardly be described as "necessary")? *Baker* provides no answer, having admittedly made "no attempt to define the bounds of this exception." *Baker*, 84 F.4th at 388.

All of this "present[s] serious practical difficulties" regarding police judgment and tactics that, ultimately, have no bearing on whether a property interest has been "taken." *Lingle*, 544 U.S. at 544; *see also* *Cedar Point*, 594 U.S. at 148 ("The government must pay for what it takes.").

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed, and this case should be remanded for further proceedings.

Dated: May 28, 2024

Respectfully Submitted,

/s/ Jeffrey Redfern

**BONA LAW PC**
Luke Hasskamp
Jarod Bona
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
luke.hasskamp@bonalawpc.com
jarod.bona@bonalawpc.com

**INSTITUTE FOR JUSTICE**
Jeffrey Redfern
Suranjan Sen
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jredfern@ij.org
ssen@ij.org

*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

Plaintiff-Appellant is not aware of any related cases.

Dated: May 28, 2024

/s/ Jeffrey Redfern
Jeffrey Redfern
*Counsel for Plaintiff-Appellant*

# FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS
# 9TH CIR. CASE NUMBER 24-2422

I am the attorney or self-represented party.

**This brief contains 11,241 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ Jeffrey Redfern **Date:** May 28, 2024